AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

**LODGED**
CLERK, U.S. DISTRICT COURT
3/23/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: ___VAM___ DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT
3/23/22
CENTRAL DISTRICT OF CALIFORNIA
BY: ___SLO___ DEPUTY

|  |  |
|---|---|
| United States of America<br><br>v.<br><br>MILTON MEDINA and JOSE RAFAEL GALAVIZ,<br><br>Defendant(s) | Case No.  2:22-mj-01177-DUTY |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of March 23, 2022 in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(1)(A) | Dealing in Firearms without a License |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
/S/
*Complainant's signature*

_____
Jason Malik, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____3/23/22_____

_____
*Judge's signature*

City and state:  Los Angeles, California

Hon. John McDermott, U.S. Magistrate Judge
*Printed name and title*

AUSA: Varun Behl

## **AFFIDAVIT**

I, Jason Malik, being duly sworn, declare and state as follows:

### **I.   INTRODUCTION**

1.    I am a Task Force Officer ("TFO") with United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), currently assigned to the Los Angeles Field Division, Group II / Los Angeles Police Department ("LAPD"), Metropolitan Division Task Force.  I have been a peace officer for the LAPD for approximately 24 years.  My mission within this task force includes reducing gang-related and violent crime, assisting in the investigation, identification, location, and apprehension of persons that have committed crimes within the City of Los Angeles or against the United States, and utilizing proactive methods to monitor and prevent criminal activity.  I have been assigned to the Metropolitan Division / ATF Task Force for approximately six years.

2.    I received seven months of basic law enforcement training while attending the Los Angeles Police Academy.  I have also received several specialized training blocks in narcotics and firearms.  During my time as a peace officer, I have conducted hundreds of firearms and narcotic related investigations, including conducting surveillance at known narcotics, gang, and illegal firearm sales locations and observing the actions and methods utilized by offenders in the course of buying and selling contraband.

## II. <u>PURPOSE OF AFFIDAVIT</u>

3.     This affidavit is made in support of a criminal complaint and arrest warrants against Milton MEDINA, also known as "Milton Median Hernandez" and "Milton Mauricio Medina" ("MEDINA"), and Jose Rafael GALAVIZ ("GALAVIZ") for violation of 18 U.S.C. § 922(a)(1)(A) (Dealing in Firearms without a License).

4.     This affidavit is also made in support of a criminal complaint and arrest warrant against Jose FLORES ("FLORES") for violation of 21 U.S.C. § 841(a)(1) (Distribution of a Controlled Substance).

5.     This affidavit is also made in support of an application for warrants to search the following:

        a.     The person of MEDINA, including any digital devices on him, as described more fully in Attachment A-1; and

        b.     The person of GALAVIZ, including any digital devices on him, as described more fully in Attachment A-2;

        c.     The person of FLORES, including any digital devices on him, as described more fully in Attachment A-3;

        d.     A green, white, and grey 1988 Fleetwood Southwind recreational vehicle, bearing California license plate 8ESE432, as described more fully in Attachment A-4 ("SUBJECT VEHICLE 1");

        e.     A black 1999 Toyota Tacoma bearing California license plate 18012N2, as described more fully in Attachment A-5 ("SUBJECT VEHICLE 2"); and

        f.     A blue Ford F150, bearing California license plate 6Y56910, as described more fully in Attachment A-6

("SUBJECT VEHICLE 3").

6.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 371 (Conspiracy), 922(a)(1)(A) (Dealing in Firearms without a License), and 922(g)(1) (Felon in Possession of a Firearm); Title 21, United States Code, Sections 846 (Conspiracy) and 841 (Distribution and Possession with Intent to Distribute Controlled Substances); and Title 26, United States Code, Section 5861 (Possession of Unregistered Firearms) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1 through A-6 and B are incorporated herein by reference.

7.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrants, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

8.    Between January 3, 2022, and February 23, 2022, an ATF

Confidential Informant (the "CI")[1] purchased firearms and suspected methamphetamine on three separate occasions from MEDINA, firearms and suspected methamphetamine from MEDINA and GALAVIZ on one occasion, and firearms and suspected methamphetamine from MEDINA and FLORES on one occasion.  MEDINA and GALAVIZ do not possess federal firearms licenses.

9.   For each of these sales, SUBJECT VEHICLE 1, SUBJECT VEHICLE 2, or SUBJECT VEHICLE 3 were used either to transport MEDINA, GALAVIZ, or FLORES or the contraband to the location of the transaction or to store the contraband.

### IV. STATEMENT OF PROBABLE CAUSE

10.   Based on my review of law enforcement reports, conversations with other law enforcement agents and officers, conversations with other witnesses, and my own knowledge of the investigation, I know the following:

**A.   On December 28, 2021, the CI Meets MEDINA**

11.   On or about December 28, 2021, I was contacted by the CI, who informed me that he/she met a person who was possibly selling firearms and narcotics.  The CI stated that he/she had met this person through a mutual friend.  The CI said he/she was

---

[1]   The CI has been compensated approximately $4,000 thus far for his assistance in this investigation.  Over the past three years, the CI has been paid a total of $30,000 for all of the assistance he/she has provided.  The CI has prior felony convictions for identity theft, possession of narcotics for sales, and domestic violence.  The CI has misdemeanor convictions for domestic battery, possession of a fraudulent identification, false personation, domestic violence, and driving on a suspended license.  The CI also has a number of arrests.  The CI has worked with ATF on several occasions over the past three years and has consistently provided credible and reliable information.

in the friend's vehicle and went to SUBJECT VEHICLE 1 parked on Rio Vista Avenue, near Soto Street, in Los Angeles, California.

12.   While in SUBJECT VEHICLE 1, the friend introduced the CI to a person named "Milton."  Based on the CI's observations in SUBJECT VECHILE 1, the CI believed that "Milton" was involved in criminal activity.  The CI said that "Milton" appeared to buy or sell stolen vehicles and other stolen goods; the CI saw "Milton" selling suspected narcotics; the CI saw several pounds of suspected methamphetamine inside SUBJECT VEHICLE 1; and the CI saw multiple firearms inside SUBJECT VEHICLE 1.

13.   The CI provided "Milton's" phone number as (562) 351-0363.  Utilizing law enforcement databases, I identified "Milton" as MEDINA.  After viewing a photograph of MEDINA, the CI confirmed that the "Milton" he/she had seen in SUBJECT VEHICLE 1 was MEDINA.

**B.    On January 3, 2022, MEDINA Sells the CI a Short-Barrel Shotgun, Ammunition, and Suspected Methamphetamine**

14.   Based on my review of recorded video surveillance, my conversations with other law enforcement agents, and my own observations, I learned the following series of events from January 3, 2022:

a.    The CI suggested to law enforcement that he/she should show up to SUBJECT VEHICLE 1 unannounced and see what MEDINA might sell to the CI.

b.    On or about January 3, 2022, I outfitted the CI with a camera recording device and an electronic transmitting device.  The CI was given $5,000 dollars to purchase firearms or

suspected narcotics.  I searched the CI for contraband and found none.  LAPD officers and ATF special agents then set up a surveillance team near Rio Vista Avenue and Soto Street in Los Angeles, California, near where SUBJECT VEHICLE 1 was parked.

c.    Around 4:45 p.m., the CI went to the area of Rio Vista Ave and Soto St.  Upon arriving in the area, the CI met with an unknown male and asked the male if "Milton" was around. The male directed the CI to the sidewalk underneath a tarp. Once there, the CI saw a female next to SUBJECT VEHICLE 1.  The CI then saw MEDINA seated inside SUBJECT VEHICLE 1.

d.    The CI and MEDINA began to have a conversation about the price of methamphetamine and various firearms.  The CI then gave $2,600 to MEDINA in exchange for methamphetamine and a firearm.  MEDINA placed a call to an unknown person to bring him more methamphetamine.  While waiting for the methamphetamine to be delivered to SUBJECT VEHICLE 1, MEDINA told the CI that he knew a person who was selling rifles and another person who was making firearms.

e.    While the CI was in SUBJECT VECHILE 1, other unknown people showed up to SUBJECT VEHICLE 1 to either buy narcotics or to pay debts owed to MEDINA.  MEDINA retrieved a sawed-off shotgun from within SUBJECT VEHICLE 1.  The shotgun was wrapped in plastic.  MEDINA cut the plastic from the shotgun and displayed it to the CI.  MEDINA told the CI that the shotgun had been used in crimes.  MEDINA then placed the sawed-off shotgun inside a black bag.

f.    At approximately 5:20 p.m., an unknown person

arrived at SUBJECT VEHICLE 1.  The person walked inside SUBJECT
VEHICLE 1 and met with MEDINA.  The person gave MEDINA a bag.
MEDINA reached inside the bag and removed a clear plastic wrap
containing suspected methamphetamine and handed it to the CI.
The CI examined the suspected methamphetamine and handed it back
to MEDINA.  MEDINA then placed the suspected methamphetamine
inside the bag which also contained the sawed-off shotgun.  The
CI took the bag and returned to a predetermined staging
location.

       g.    At the staging location, I recovered the bag
containing a Mossberg model 495T shotgun, bearing serial number
1345927, eight rounds of 12-gauge ammunition, and suspected
methamphetamine.  I again searched the CI for contraband.  There
was no other contraband found on the CI.  I measured the
shotgun's barrel, which was approximately 13 inches long.  The
shotgun also had what appeared to be cut marks on the end of the
barrel.  I also weighed the suspected methamphetamine, which had
a gross weight of approximately 491 grams.

    **C.    On January 11, 2022, MEDINA and GALAVIZ Sell the CI
       Four Ghost Guns and Suspected Methamphetamine**

   15.  On or about January 7, 2022, the CI spoke with MEDINA.
During this conversation, MEDINA told the CI that that the price
of methamphetamine was $2,200 per pound, the price of a 9mm
handgun was $1,200, the price of a .40 caliber handgun was
between $1,400 and $1,500, and the price of an AR15 style rifle
was between $1,500 and $1,700.  MEDINA told the CI to call him
about an hour before the CI arrives to SUBJECT VEHICLE 1 so

MEDINA could contact the supplier.

16. Based on my review of recorded video surveillance, my conversations with other law enforcement agents, and my own observations, I learned the following series of events from January 11, 2022.

a. On or about January 11, 2022, I outfitted the CI with a camera recording device and an electronic transmitter device. I searched the CI for contraband and found none. The CI was given $8,000 dollars to complete the transaction with MEDINA. LAPD officers and ATF special agents then set up a surveillance team near Rio Vista Avenue and Soto Street in Los Angeles, California.

b. Upon arriving at Rio Vista Avenue and Soto Street, the CI walked to the open door of SUBJECT VEHICLE 1, and saw MEDINA and an unknown male seated inside. The CI began speaking with MEDINA. MEDINA told the CI that he had one of the firearms and the methamphetamine and another person would be bringing the additional firearms. The CI gave $8,000 to MEDINA. After about 25 minutes of speaking with MEDINA, MEDINA told the CI to wait in the CI's vehicle until the other firearms arrive. While the CI was in SUBJECT VECHILE 1, other, unknown people came to SUBJECT VEHICLE 1 and appeared to purchase contraband from MEDINA. The CI walked back to the CI's vehicle and sat inside.

c. At approximately 2:55 p.m., LAPD officer John

Bain saw SUBJECT VEHICLE 2[2] arrive at the location and park next to SUBJECT VEHICLE 1.  Officer Bain saw a male driver leave the car carrying what appeared to be a heavy bag.  The driver was later identified as GALAVIZ.  GALAVIZ got out of SUBJECT VEHICLE 2, approached SUBJECT VEHICLE 1 and walked under the tarp, out of the view of law enforcement.

   d.   At approximately 3:20 p.m., the CI exited the CI's vehicle and walked back to SUBJECT VEHICLE 1.  Upon approaching SUBJECT VEHICLE 1, the unknown male that was originally seated inside the trailer next to MEDINA was standing under the tarp, behind an accordion-style gate and appeared to be acting as security.  The unknown male opened the gate and allowed the CI to enter.  The CI approached the door of SUBJECT VEHICLE 1 and observed MEDINA seated inside with GALAVIZ.  GALAVIZ was wearing rubber gloves.  MEDINA was holding what appeared to be an AR style pistol in his right hand and an AR style rifle in his left hand.  GALAVIZ told the CI that the AR rifle could take .223 caliber ammunition, or 5.56 caliber ammunition and the AR pistol could only take .223 caliber ammunition.  GALAVIZ also told the CI that GALAVIZ made the firearms, and they all work and that nobody else has used them.

   e.   The three continued to talk.  GALAVIZ explained to the CI about the magazines and how they could be illegal in California.  He also told the CI he could get drum magazines.  GALAVIZ told the CI that the AR rifle would not fit in the bag

---

[2] ATF TFO Tim Jang drove by the truck and saw SUBJECT VEHICLE 2's license plate.

and removed the take down pins, separating the upper receiver from the lower receiver and placed it in the bag.  During the transaction, MEDINA appeared to have a handgun sitting next to his right leg.  The CI then obtained the duffel bag containing the four firearms and suspected methamphetamine and walked back to the CI's vehicle.  The CI then drove to a predetermined staging location.

f.   At the staging location, I recovered the bag from the CI's vehicle containing the firearms and methamphetamine. The CI was searched again for contraband.  There was no other contraband found on the CI.  I examined the contents of the bag and observed one AR style rifle lacking a serial number (commonly referred to as a "ghost gun"), one AR style ghost gun pistol, two ghost gun Glock style handguns and a brick of suspected methamphetamine.  I weighed the suspected methamphetamine, which had a gross weight of approximately 488 grams.

g.   By searching law enforcement databases, I identified the driver of SUBJECT VEHICLE 2 as GALAVIZ.

**D.   On January 24, 2022, MEDINA Sells the CI One Rifle and Suspected Methamphetamine**

17.  On or about January 20, 2022, I spoke with the CI who said that he/she had tried to contact MEDINA, but MEDINA would not answer his phone.  The CI suggested that he/she arrive unannounced again and see what MEDINA had available to sell.

18.  Based on my review of recorded video surveillance, my conversations with other law enforcement agents, and my own

observations, I learned the following series of events from
January 24, 2022:

      a.  On or about January 24, 2022, I outfitted the CI
with a camera recording device and an electronic transmitter
device.  I searched the CI for contraband and found none.  The
CI was given $5,000 dollars to purchase firearms or narcotics.
LAPD officers and ATF special agents then set up a surveillance
team near Rio Vista Avenue and Soto Street in Los Angeles,
California.

      b.  Upon arriving at Rio Vista Avenue and Soto
Street, the CI walked up to SUBJECT VEHICLE 1, knocked on its
door, and announced his/her presence.  Once inside SUBJECT
VEHICLE 1, the CI saw MEDINA and an unknown female.  The CI
began speaking with MEDINA about purchasing methamphetamine and
firearms.  MEDINA agreed to sell the CI both methamphetamine and
firearms.  MEDINA told the CI that the firearm was in a
different trailer and to go knock on the door of that trailer.
The CI gave MEDINA $3,000: $2,000 for the methamphetamine and
$1,000 for the firearm.

      c.  Following MEDINA's direction, the CI then left
SUBJECT VEHICLE 1 and walked south to a nearby trailer.  The CI
knocked on the door of the trailer and told the occupant that
"Milton" wanted to speak with her.  The CI then walked back to
SUBJECT VEHICLE 1.  At approximately 2:18 p.m., LAPD officer
Ruben Rodriguez saw a female wearing a white top and blue pants
leave the adjacent trailer and walk to SUBJECT VEHICLE 1.  The
female met with MEDINA and then quickly walked back to her

trailer.  At approximately 2:23 p.m., Officer Rodriguez saw the same female exit the adjacent trailer carrying a long bag over her shoulder.  The female went to SUBJECT VEHICLE 1 again. Approximately five minutes later, the female left SUBJECT VEHICLE 1 not carrying anything.

         d.   In SUBJECT VEHICLE 1, MEDINA removed a rifle from the bag given to MEDINA by the female.  MEDINA explained to the CI that the rifle was missing a screw, so it was taped along the bottom.  MEDINA then put the rifle back into the bag and placed a sock over the barrel.  MEDINA handed the CI the bag with the rifle and another bag containing the suspected methamphetamine. At approximately 2:30 p.m., the CI left SUBJECT VEHICLE 1 and walked back to the CI's vehicle.  The CI then returned to a predetermined staging location.

         e.   At the staging location, I recovered the bags from the CI's vehicle that had the firearm and suspected methamphetamine.  The CI was searched again for contraband. There was no other contraband found on the CI.  I examined the bag's contents and saw a Rock Island Armory rifle, bearing serial number 119744, and a brick of suspected methamphetamine. I also weighed the suspected methamphetamine, which had a gross weight of approximately 480 grams.

     **E.  On February 9, 2022, MEDINA Sells the CI Two Rifles, One Pistol, and Suspected Methamphetamine**

   19.  On or about February 8, 2022, the CI contacted MEDINA and asked about purchasing additional firearms and narcotics. MEDINA told the CI that MEDINA had additional contraband to sell

to the CI.[3]  The deal was set for February 9, 2022.

20.  Based on my review of recorded video surveillance, my conversations with other law enforcement agents, and my own observations, I learned the following series of events from February 9, 2022:

    a.  On or about February 9, 2022, I outfitted the CI with a camera recording device and an electronic transmitter device.  I searched the CI for contraband and found none.  The CI was given $7,000 dollars to purchase firearms and narcotics. LAPD officers and ATF special agents then set up a surveillance team near Rio Vista Avenue and Soto Street in Los Angeles, California.

    b.  Around 6:32 p.m., the CI texted MEDINA that the CI would arrive in approximately 30 minutes.

    c.  Around 7 p.m., upon arriving to Rio Vista Ave and Soto St, the CI walked to passenger side of SUBJECT VEHICLE 1. The CI approached the open door and observed MEDINA and two other unknown males.  The CI greeted MEDINA and handed him $7,000.  After counting the money, MEDINA handed the CI three firearms: one Remington Arms rifle, one Mosin-Nagant rifle, and one Rock Island Armory pistol.  The CI put the firearms inside bags, which the CI then placed inside the CI's vehicle.

    d.  The CI then walked back to SUBJECT VECHILE 1. MEDINA then reached inside of a bag in front of him, removed a clear plastic containing suspected methamphetamine, and gave the

---

[3] During the recording of this phone call, the recording application suffered a technical error and stopped recording.

suspected methamphetamine to the CI.  The CI also placed the
suspected methamphetamine inside the CI's vehicle.  The CI then
travelled back to a predetermined staging location.

     e.  At the staging location, I recovered the bag from
the CI's vehicle containing the firearms and suspected
methamphetamine.  I again searched the CI for contraband.  There
was no other contraband found on the CI.  I examined the
contents of the bag, inside of which I saw: one Remington Arms
rifle, model 597, bearing serial code 2791104; one Mosin-Nagant
rifle, bearing serial number M44028455; one Rock Island Armory
pistol, model 1911A, bearing serial number RIA2477363; and a
brick of suspected methamphetamine.  I also weighed the
suspected methamphetamine, which had a gross weight of
approximately 469 grams.

     **F.  On February 23, 2022, MEDINA and FLORES Sell the CI
        One Rifle, One Pistol, and Suspected Methamphetamine**

    21.  On or about February 16, 2022, I learned that one of
the firearms, the Rock Island Armory pistol, that the CI had
purchased from MEDINA on February 9, 2022, had been stolen.  I
contacted the CI and asked him/her to see if MEDINA had any
additional firearms, specifically any additional Rock Island
Armory pistols.

    22.  The CI contacted MEDINA.  MEDINA told the CI that he
had one firearm but was still waiting on his "connect" to verify
any additional firearms.  The CI suggested that he/she would buy
that firearm and see if MEDINA's "connect" could deliver the
other firearms.  A deal was set for February 23, 2022.

23.   Based on my review of recorded video surveillance, my conversations with other law enforcement agents, and my own observations, I learned the following series of events from February 23, 2022:

a.   On or about February 23, 2022, I outfitted the CI with a camera recording device and an electronic transmitter device.  I searched the CI for contraband and found none.  The CI was given $9,000 dollars to purchase firearms and narcotics. LAPD officers and ATF special agents then set up a surveillance team near Rio Vista Avenue and Soto Street in Los Angeles, California.  LAPD officer Mike Martinez observed SUBJECT VEHICLE 3, parked next to SUBJECT VEHICLE 1.

b.   On February 23, 2022, upon arriving at the area of Rio Vista Avenue and Soto Street, the CI walked to the passenger side of SUBJECT VEHICLE 1, and saw an unknown person walking away from the trailer.  The CI entered the trailer and met with MEDINA and another male Hispanic wearing a blue Dodgers jersey.  This male was later identified as FLORES.

c.   While inside SUBJECT VEHICLE 1, the CI and MEDINA spoke about the price of the firearms and methamphetamine.  The CI then gave MEDINA $4,500.  FLORES left SUBJECT VEHICLE 1 and an unknown female and an unknown male then entered SUBJECT VEHICLE 1.  MEDINA handed the CI a handgun, which the CI inspected.  While the CI was inspecting it, MEDINA called out for "Toro" on several occasions.  MEDINA also told the CI that a female would get the rifle and bring it to the CI.

d.   At approximately 2:51 p.m., Officer Martinez

observed FLORES retrieve a clear plastic bag from SUBJECT
VEHICLE 3 parked in the street.  Officer Martinez said that
FLORES folded the bag over and carried it back to SUBJECT
VEHICLE 1.  Inside SUBJECT VEHICLE 1, FLORES gave the clear
plastic bag to MEDINA.  MEDINA put the clear plastic bag inside
another bag, along with the Rock Island gun box containing the
firearm.  The CI took the bag containing the suspected
methamphetamine and handgun to the CI's vehicle and placed them
inside.  The CI walked back to the trailer.  Inside the trailer,
MEDINA, FLORES, and the other unknown male had a conversation.
MEDINA then told the female inside the trailer to get the rifle.
The female left the trailer.  MEDINA and the CI said their
goodbyes and the CI walked to the CI's vehicle.

     e.   Officer Martinez observed the female leave
SUBJECT VEHICLE 1.  He described the female as being
approximately 5 feet, 5 inches, about 140 pounds, with red hair,
and wearing a black shirt and red pants.  Officer Martinez saw
the female enter an adjacent trailer.  At approximately 3:01
p.m., the CI entered the CI's vehicle and re-positioned it in
the street.  About a minute later, Officer Martinez observed the
same female exit her trailer carrying what appeared to be a
rifle with a jacket over top of it.  The female approached the
CI's vehicle and placed the rifle inside the CI's vehicle.  The
CI then travelled back to a predetermined staging location.

     f.   At the staging location, I removed the bag
containing the firearm and suspected methamphetamine and the
rifle from the CI vehicle.  I again searched the CI for

contraband.  There was no other contraband found on the CI.
Inside the CI's bag, I found one Rock Island Armory pistol,
model 1911A, bearing serial number RIA2477363, and a bag of
suspected methamphetamine.  I also found one Rock Island Rifle,
bearing serial number 307026, in the CI's vehicle.  I also
weighed the suspected methamphetamine, which had a gross weight
of approximately 460 grams.

    g.    Law enforcement officers remained near SUBJECT
VEHICLE 1.  At approximately 3:10 p.m., Officer Martinez
observed FLORES leave SUBJECT VEHICLE 1 and enter SUBJECT
VEHICLE 3.  FLORES then began to drive away from SUBJECT VEHICLE
1.  LAPD officers Jeff Punzalan and Alejandro Higareda conducted
a traffic stop on SUBJECT VEHICLE 3 and, in the course of the
stop, identified the driver of SUBJECT VEHICLE 3 as FLORES.
FLORES is a documented 8th Street gang member with the moniker
of "Toro."

### G.    MEDINA and GALAVIZ Do Not Have Federal Firearms Licenses

24.  On or about March 14, 2022, an ATF Industry Operations
Investigator, conducted a search of the Firearms Licensing
System.  This query did not yield any current, former, or
pending applications for firearm licenses or firearm licenses
for MEDINA or GALAVIZ.

### H.    MEDINA Does Not Have Any Firearms Registered to Him in the National Firearms Registry

25.  On or about March 14, 2022, a query into the National
Firearms Registration and Transfer System ("NFRTS") was
conducted.  The NFRTS contains information on all firearms

covered by the National Firearms Act ("NFA"), which includes short-barreled shotguns.  Based on the NFRTS query, MEDINA does not have any NFA firearms registered to him.

**I.   MEDINA's Criminal History**

26.   I reviewed a California Law Enforcement Telecommunications System ("CLETS") criminal history report and a Los Angeles County Consolidated Criminal History Report System ("CCHRS") criminal history for MEDINA and learned that he has the following convictions and restraining order:

        a.   On or about April 23, 2019, MEDINA was convicted for a violation of California Penal Code, Section 487(d)(1), Grand Theft Auto, in the Superior Court for the State of California, County of Los Angeles, Case Number KA120820.

        b.   On or about October 18, 2019, MEDINA was convicted for a violation of California Penal Code, Section 459, Burglary, in the Superior Court for the State of California, County of Los Angeles, Case Number VA148762.

        c.   On or about March 20, 2017, MEDINA was convicted for a violation of California Penal Code, Section 243(e)(1), Domestic Battery, in the Superior Court for the State of California, County of Los Angeles, Case Number 6ES04655.

        d.   On or about March 19, 2019, MEDINA was issued a restraining order in the Superior Court for the State of California, County of Los Angeles, case number 6ES04655.

**J.   GALAVIZ's Criminal History**

27.   I reviewed a CLETS criminal history report and a CCHRS criminal history for GALAVIZ and learned that he has the

following convictions:

       a.   On or about October 22, 1990, GALAVIZ was convicted for a violation of California Penal Code, Section 245(a)(1), Assault with a Deadly Weapon Not a Firearm, in the Superior Court for the State of California, County of Los Angeles, Case Number BA011716.

       b.   On or about December 20, 1994, GALAVIZ was convicted for a violation of California Health & Safety Code, Section 11351.5, Possession of Controlled Substances for Sale, in the Superior Court for the State of California, County of Los Angeles, Case Number BA106366.

       c.   On or about July 30, 2002, GALAVIZ was convicted for violations of California Vehicle Code, Section 2800.2(a), Evading a Police Officer, and California Vehicle Code, Section 20002.A, Misdemeanor Hit and Run, in the Superior Court for the State of California, County of Los Angeles, Case Number BA234654.

**K.   FLORES's Criminal History**

28.   I reviewed a CLETS criminal history report and a CCHRS criminal history for FLORES and learned that he has the following convictions:

       a.   On or about August 25, 2004, FLORES was convicted for a violation of California Penal Code, Section 12031(a)(1), Carrying a Loaded Firearm, in the Superior Court for the State of California, County of Los Angeles, Case Number BA251289.

       b.   On or about February 23, 2006, FLORES was convicted for violation of California Penal Code, Section

12021(a)(1), Possession of a Firearm by a Felon, in the Superior Court for the State of California, County of Los Angeles, Case Number BA295739.

c.   On or about February 11, 2009, FLORES was convicted for violations of California Penal Code, Section 12021(a)(1), Possession of a Firearm by a Felon, and California Penal Code, Section 626.9(b), Possession of a Firearm within a School Zone, in the Superior Court for the State of California, County of Los Angeles, Case Number BA346988.

d.   On or about March 2, 2016, FLORES was convicted for a violation of California Penal Code, Section 245(a)(1), Robbery – First Degree, in the Superior Court for the State of California, County of Los Angeles, Case Number BA434030.

**L.   Interstate Nexus**

29.   On or about March 14, 2022, ATF Interstate Nexus Expert David Gonzalez examined the following firearms: the Mossberg short-barrel shotgun, model 495T, bearing serial number 1345927; the Rock Island Armory rifle, bearing serial number 119744; Rock Island pistol, model 1911A, bearing serial number RIA2477364; Mosin-Nagant rifle, bearing serial number M44028455; Remington Arms rifle, model 597, bearing serial number 2791104; Rock Island pistol, model 1911A, bearing serial number RIA2477363; and Rock Island rifle, bearing serial number 307026. Interstate Expert Gonzalez confirmed that the firearms were manufactured outside of the State of California.  Because the firearms were found in California, I believe that the firearms have traveled in and affected interstate commerce.

## II.  <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

30.  Based on my training and experience and familiarity
with investigations into drug trafficking conducted by other law
enforcement agents, I know the following:

a.  Drug trafficking is a business that involves
numerous co-conspirators, from lower-level dealers to higher-
level suppliers, as well as associates to process, package, and
deliver the drugs and launder the drug proceeds.  Drug
traffickers often travel by car, bus, train, or airplane, both
domestically and to foreign countries, in connection with their
illegal activities in order to meet with co-conspirators,
conduct drug transactions, and transport drugs or drug proceeds.

b.  Drug traffickers often maintain books, receipts,
notes, ledgers, bank records, and other records relating to the
manufacture, transportation, ordering, sale and distribution of
illegal drugs.  The aforementioned records are often maintained
where the drug trafficker has ready access to them, such as on
their persons, in their residences and vehicles, and on their
cell phones and other digital devices.

c.  Communications between people buying and selling
drugs take place by telephone calls and messages, such as e-
mail, text messages, and social media messaging applications,
sent to and from cell phones and other digital devices.  This
includes sending photos or videos of the drugs between the
seller and the buyer, the negotiation of price, and discussion
of whether or not participants will bring weapons to a deal.  In
addition, it is common for people engaged in drug trafficking to

have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

        d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

### III. <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

31.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct firearms investigations, I know the following:

        a.    Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence or business, or in places that are readily accessible, and under their physical control, such as on their persons, in their vehicles, or on their digital devices.  It has been my experience that individuals who own or sell firearms illegally will keep the contact information of individuals who are supplying firearms or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices on their person and in backpacks or purses in their vicinity.

b.    Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.    Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

## IV.   <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[4]

32.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[4] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

  33. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

   a. Digital data are particularly vulnerable to

inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

34.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock

function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress MEDINA, GALAVIZ, and FLORES's thumbs- and/or fingers on the device(s); and (2) hold the device(s) in front of MEDINA, GALAVIZ, and FLORES's faces with their eyes open to activate the facial-, iris-, and/or retina-recognition feature.

35. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## V.   <u>REQUEST FOR NIGHTTIME SERVICE</u>

36. I request that the Court authorize investigators to serve MEDINA's arrest warrant during the nighttime, as set forth under Fed. R. Crim. Proc. 41(e)(2)(A)(ii). Good cause for nighttime service exists because of the heightened risk of violence from MEDINA, described above. The ability to serve the

requested warrants at night will provide law enforcement with a better opportunity to enter SUBJECT VEHICLE 1 without incident to ensure everyone's safety.  Given these facts, I believe that nighttime service is warranted in this case.

## VI.   CONCLUSION

37.  For all of the reasons described above, there is probable cause to believe that MEDINA and GALAVIZ have violated 18 U.S.C. § 922(a)(1)(A) (Dealing in Firearms without a License), and FLORES has violated 21 U.S.C. § 841(a)(1) (Distribution of a Controlled Substance).

38.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the persons described in Attachment A-1, A-2, and A-3 and SUBJECT VEHICLE 1, SUBJECT VEHICLE 2, and SUBJECT VEHICLE 3 described in Attachments A-4, A-5, and A-6.


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 23rd day of  March   , 2022.

_John E. McDermott_

_____
UNITED STATES MAGISTRATE JUDGE